**Eric Lechtzin (I.D. # 248958)**
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N-300
Newtown, PA 18940
Telephone: (215) 867-2399
Facsimile: (267) 685-0676
elechtzin@edelson-law.com

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| **MIA GARCIA and JACQULYN MCGLYNN**, individually and on behalf of those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**FARMERS INSURANCE EXCHANGE and FARMERS GROUP, INC.,**<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Mia Garcia and Jacqulyn McGlynn ("Plaintiffs") bring this Class Action Complaint ("Complaint"), on behalf of themselves and all others similarly situated, against Defendants Farmers Insurance Exchange and Farmers Group, Inc., ("Farmers" or "Defendants") for failure to properly secure and safeguard Plaintiffs' and Class members' personally identifiable information ("PII") stored within Defendant's information network and alleging as follows, based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to them, which is based on personal knowledge:

## NATURE OF THE CASE

1. Entities that provide services and handle customers and employees' sensitive PII owe a duty to the individuals to whom that data relates. This duty arises because it is foreseeable that the exposure of PII to unauthorized persons—especially hackers with nefarious intentions—will result in harm to the affected individuals, including, but not limited to, the invasion of their private financial matters.

2. The harm resulting from a breach of private data manifests in a number of ways, including identity theft and financial fraud. The exposure of a person's PII through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. Mitigating that risk—to the extent it is even possible to do so—requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and to take a number of additional prophylactic measures.

3. As a provider of insurance services, Farmers knowingly obtains sensitive customer and employee PII and has a resulting duty to securely maintain such information in confidence.

4. As discussed in more detail below, Farmers breached its duty to protect the sensitive PII entrusted to it. As such, Plaintiffs bring this Class action on behalf of themselves and all other individuals whose PII was accessed and exposed to unauthorized third parties during a data breach of Defendant's system which was announced when Farmers began mailing out notices to affected individuals on or about August 22, 2025 (the "Data Breach"). According to information that provided to Maine Attorney General's Office, a combined total of 1,111,386 customers were impacted.[1]

---

[1] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/8e99d3e3-b1f1-4f30-bbb9-be7dfca5e281.html (last visited September 12, 2025).

5. According to cybernews sources, on approximately May 29, 2025, a ransomware group accessed Defendant's information network through a third-party vendor.[2] Scattered Spider, a ransomware group, is believed to have accessed Defendant's information network, while another, associated group, issued a ransom demand.[3]

6. Farmers announced that "one of Farmers' third-party vendors alerted Farmers to suspicious activity involving an unauthorized actor accessing one of the vendor's databases containing Farmers customer information."[4] The exfiltrated data includes customer names, address, dates of birth, driver's license number, and/or last four digits of Social Security number.[5]

7. Other companies impacted in these attacks include Google, Cisco, Workday, Adidas, Qantas, Allianz Life, and the LVMH subsidiaries Louis Vuitton, Dior, and Tiffany & Co.[6]

8. Cybercriminals such as Scattered Spider frequently engage in double extortion tactics, demanding ransom and then publishing the stolen data. Cybercriminal groups also reportedly share its tactics with other hackers, enabling other groups to conduct renewed attacks on victims in exchange for a percentage of the ransom.[7]

9. As a part of these cyberattack tactics, cybercriminals, as a matter of course, issue a ransom demand to targets, threatening to release all stolen information obtained from the data breach onto its leak page and demanding that target companies pay to obtain access to its

---

[2] https://www.bleepingcomputer.com/news/security/farmers-insurance-data-breach-impacts-11m-people-after-salesforce-attack/ (last visited September 12, 2025).

[3] *Id.*

[4] https://securityaffairs.com/181576/data-breach/farmers-insurance-discloses-a-data-breach-impacting-1-1m-customers.html (last visited September 12, 2025).

[5] https://www.carriermanagement.com/news/2025/08/25/278778.htm (last visited September 12, 2025).

[6] *Id.* n.2, *supra*.

[7] https://www.coalitioninc.com/blog/security-labs/scattered-spider-hacker-collective-ensnaring-industry-specific-targets (last visited September 12, 2025).

systems. However, Defendant has provided no public information on the ransom demand or payment.

10. As a direct and proximate result of Farmers' inadequate data security, and breach of its duty to handle PII with reasonable care, Plaintiffs' PII has been accessed by hackers, potentially posted on the dark web, and exposed to an untold number of unauthorized individuals.

11. Plaintiffs are now at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their health privacy, and similar forms of criminal mischief, and such risk may last for the rest of their life. Consequently, Plaintiffs must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

12. To recover from Farmers for their sustained, ongoing, and future harms, Plaintiffs and Class members seek damages in an amount to be determined at trial, declaratory judgment, and injunctive relief requiring Defendant to: 1) disclose, expeditiously, the full nature of the Data Breach and the types of PII accessed, obtained, or exposed by the hackers; 2) implement improved data security practices to reasonably guard against future breaches of PII possessed by Defendant; and 3) provide, at its own expense, all impacted victims with lifetime identity theft protection services.

## PARTIES

### Plaintiffs

13. Plaintiff Mia Garcia is an adult individual and, at all relevant times herein, a resident and citizen of Texas, residing in Pflugerville, Texas. At all relevant times, Plaintiff Garcia is a Farmers customer and a victim of the Data Breach.

14. On or about August 22, 2025 Plaintiff Garcia was notified of the Data Breach and of the impact to her PII via email letter from Defendant.

15. Plaintiff Jacqulyn McGlynn is an adult individual and, at all relevant times

herein, a resident and citizen of Texas, residing in Tyler, Texas. At all relevant times, Plaintiff McGlynn is a Farmers customer and a victim of the Data Breach.

16. On or about August 22, 2025 Plaintiff McGlynn was notified of the Data Breach and of the impact to her PII via email letter from Defendant.

17. As a result of Defendant's conduct, Plaintiffs suffered actual damages including, without limitation, time related to monitoring their financial accounts for fraudulent activity, facing an increased and imminent risk of fraud and identity theft, the lost value of their personal information, and other economic and non-economic harm. Plaintiffs and Class members will now be forced to expend additional time, efforts, and potentially expenses to review their credit reports, monitor their financial accounts, and monitor for fraud or identity theft – particularly since the compromised information may include Social Security numbers.

**Defendants**

18. Defendant Farmers Insurance Exchange is a reciprocal insurance exchange organized under the laws of the State of California and with its principal place at 6301 Owensmouth Avenue, Woodland Hills, California 91367.

19. Defendant Farmers Group, Inc. is a Nevada corporation registered to conduct business in this state with its principal place at 6301 Owensmouth Avenue, Woodland Hills, California 91367.

20. Together, Farmers provides insurance and ancillary services, including a wide range of products: auto, home, renters, life, and small business insurance, plus specialty coverage in 50 states, and employs over 48,000 exclusive and independent agents and approximately 21,000 employees.[8]

21. The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged here

[8] https://www.linkedin.com/company/farmers-insurance/about/ (last visited September 12, 2025).

are currently unknown to Plaintiff.

22. Plaintiffs will seek leave of court to amend this Complaint to reflect the true names and capacities of the responsible parties when their identities become known.

## JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d). The amount in controversy in this Class action exceeds $5,000,000, exclusive of interest and costs, and there are numerous Class members who are citizens of states other than Defendant's state of citizenship.

24. This Court has personal jurisdiction over the parties in this case. Defendant Farmers conducts business in this District and is a citizen of this District by virtue of having its principal place of business located in this District.

25. Venue is proper in this District under 28 U.S.C. §1391(b) because Farmers maintains its headquarters and a transportation hub in this District and regularly conducts business in this District.

## FACTUAL BACKGROUND

**Farmers and the Services it Provides.**

26. Farmers is based in California and offers insurance policies, including auto, life, Medicare supplements, and cyber insurance to the public through its network of 48,000 agents.[9] Farmers has been in business since 1928, and presently services 19 million active policies.[10]

27. While administering services, Farmers receives and handles PII, which includes, *inter alia*, customer and employees' full name, address, Social Security number, driver's license or state ID number, financial account and payment card information.

28. Plaintiffs are Farmers' customers and entrusted their information to Farmers

---

[9] *Id.*
[10] *Id.*

with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

29. By obtaining, collecting, and storing Plaintiffs' PII, Farmers assumed legal and equitable duties and knew or should have known that Defendant was responsible for protecting Plaintiffs' PII from unauthorized disclosure.

30. And, upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiff and the Class members to entities that retain Farmers.

**Farmers Knew the Risks of Storing Valuable PII and the Foreseeable Harm to its Customers and Employees**.

31. At all relevant times, Farmers knew it was storing sensitive PII and that, as a result, its systems would be an attractive target for cybercriminals.

32. Farmers also knew that a breach of its systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised, as well as intrusion into their highly private information.

33. Moreover, Farmers should have been aware that the financial services industry has become a prime target for cybercriminals, and thus alerted to its susceptibility to cyberattack, and taken proactive measures to enhance its data security.[11]

34. Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, "[i]nsurance companies handle vast amounts of sensitive

---

[11] https://www.syteca.com/en/blog/data-protection-compliance-insurance-industry (last visited September 12, 2025).

customer data such as personal information, financial records, and health details. As such, they must comply with strict data protection requirements. Failure to comply with these regulations can result in severe penalties, reputational damage, and loss of customer trust."[12]

35. For example, in 2023, the number of data compromises in the United States stood at 3,205 cases, affecting over 353 million individuals.[13]

36. The type and breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Defendant's customers and employees especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

37. PII is a valuable property right.[14] The value of PII as a commodity is measurable.[15] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[16] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[17] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web,"

---

[12] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[13] https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-united-states-by-number-of-breaches-and-records-exposed/ (last visited September 12, 2025).

[14] *See* Marc Van Lieshout, *The Value of Personal Data*, 457 IFIP ADVANCES IN INFORMATION & COMMUNICATION TECHNOLOGY 26 (May 2015), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . . .").

[15] Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (Apr. 28, 2014), http://www.medscape.com/viewarticle. /824192.

[16] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD 4 (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[17] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERTISING BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

for many years.

38. As a result of their real value and the recent large-scale data breaches, identity thieves and cybercriminals have openly posted credit card numbers, Social Security numbers, PII, and other sensitive information directly on various Internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated, and becomes more valuable to thieves and more damaging to victims.

39. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[18]

40. Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

41. Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some

---

[18] United States Government Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/new.items/d07737.pdf (last visited September 12, 2025).

consumers are willing to pay a premium to purchase from privacy protective websites."[19]

42. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

43. Based on the value of its customers' and employees' PII to cybercriminals and cybercriminals' propensity to target businesses, Farmers certainly knew the foreseeable risk of failing to implement adequate cybersecurity measures.

Farmers Breached its Duty to Protect its Customers and Employees PII.

44. On or about August 22, 2025, Farmers announced that it experienced a security incident disrupting access to its systems. As above, the breach occurred when a ransomware group, penetrated Farmers' information network.[20]

45. Since the Data Breach, Farmers has failed to disclose whether it paid any ransom.

46. Like Plaintiffs, other potential Class members received similar notices informing them that their PII was exposed in the Data Breach.

47. The Data Breach occurred as a direct result of Defendant's failure to implement and follow basic security procedures to protect its customers' and employees' PII.

FTC Guidelines Prohibit Farmers from Engaging in Unfair or Deceptive Acts or Practices.

48. Farmers is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

---

[19] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) Information Systems Research 254 (June 2011), https://www.guanotronic.com/~serge/papers/weis07.pdf.

[20] *Id. at* nn. 1, 2, *supra*.

49. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[21]

50. The FTC provided cybersecurity guidelines for businesses, advising that businesses should protect personal customer information, properly dispose of personal information that is no longer needed, encrypt information stored on networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[22]

51. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[23]

52. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

53. Farmers failed to properly implement basic data security practices. Farmers' failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

54. Farmers was at all times fully aware of its obligations to protect customers' and

---

[21] *Start with Security – A Guide for Business*, United States Federal Trade Comm'n (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[22] *Protecting Personal Information: A Guide for Business*, United States Federal Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personalinformation.pdf.

[23] *Id.*

employees' PII. Defendant is also aware of the significant repercussions that would result from its failure to do so.

**Cyberattacks and Data Breaches Cause Disruption and Put Consumers at an Increased Risk of Fraud and Identity Theft.**

55. Cyberattacks and data breaches at companies that store PII are especially problematic because they can negatively impact on the overall daily lives of individuals affected by the attack.

56. The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[24]

57. That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, and to take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

---

[24] *See* U.S. Gov. Accounting Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (2007), https://www.gao.gov/new.items/d07737.pdf.

58. Theft of PII is serious. The FTC warns consumers that identity thieves use PII to exhaust financial accounts, receive medical treatment, open new utility accounts, and incur charges and credit in a person's name.

59. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing freezes on their credit, and correcting their credit reports.[25]

60. Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.

61. Identity thieves can also use the victim's name and Social Security number to obtain government benefits or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, and/or rent a house or receive medical services in the victim's name.

62. Moreover, theft of PII is also gravely serious because PII is an extremely

---

[25] *See IdentityTheft.gov*, Federal Trade Commission, https://www.identitytheft.gov/Steps (last accessed September 12, 2025).

valuable property right.[26]

63. Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase PII on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves.

64. Each year, identity theft causes tens of billions of dollars of losses to victims in the United States. For example, with the PII stolen in the Data Breach, which includes Social Security numbers, identity thieves can open financial accounts, commit medical fraud, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft. These criminal activities have and will result in devastating financial and personal losses to Plaintiff.

65. As discussed above, PII is such a valuable commodity to identity thieves, and once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

66. Social Security Numbers are particularly sensitive pieces of personal information. As the Consumer Federation of America explains:

> **Social Security number:** *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refund, employment—even using your identity in bankruptcy and other legal matters. It's hard to change your Social Security number

---

[26] *See, e.g.*, John T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

and it's not a good idea because it is connected to your lift in so many ways. [27]

67. For instance, with a stolen Social Security Number, which is only one subset of the PII compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[28]

68. The Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[29] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[30] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected because one was already filed on their behalf.

69. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[31]

---

[27] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number* (Nov. 2, 2017), https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/ (emphasis added).

[28] *Id.*

[29] *Id.*

[30] *Id.* at 4.

[31] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

70. This was a financially motivated Data Breach, as the only reason the cybercriminals go through the trouble of running a targeted cyberattack against companies like Farmers is to get information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."

71. Indeed, a Social Security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[32] "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[33]

72. These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to PII, they *will use it.*[34]

73. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years later. As with income tax returns, an individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notified the individual's employer of the suspected fraud.

74. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years

---

[32] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, (Nov. 15, 2017), https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.
[33] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.
[34] *Id.*

to learn that information.[35]

75. Cybercriminals can post stolen PII on the cyber black-market for years following a data breach, thereby making such information publicly available.

76. Approximately 21% of victims do not realize their identity has been compromised until more than two years after it happened.[36] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[37]

77. Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.[38]

78. It is within this context that Plaintiff must now live with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

79. Victims of the Data Breach, like Plaintiff, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their privacy and credit because of the Data Breach.[39]

80. As a direct and proximate result of the Data Breach, Plaintiffs has had their PII exposed, have suffered harm as a result, and have been placed at an imminent, immediate, and

---

[35] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 JOURNAL OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

[36] *See* Medical ID Theft Checklist, https://www.identityforce.com/blog/medical-id-theft-checklist-2 (last visited September 12, 2025).

[37] *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches* (*"Potential Damages"*), EXPERIAN, https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last visited Apr. 17, 2023).

[38] *Guide for Assisting Identity Theft Victims*, FED. TRADE COMM'N, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.

[39] *Id.*

continuing increased risk of harm from fraud and identity theft. Plaintiffs must now take the time and effort (and spend the money) to mitigate the actual and potential impact of the Data Breach on their everyday life, including purchasing identity theft and credit monitoring services every year for the rest of their life, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions and healthcare providers, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and health insurance account information for unauthorized activity for years to come.

81. Moreover, Plaintiffs and Class members have an interest in ensuring that their PII, which remains in the possession of Farmers, is protected from further public disclosure by the implementation of better employee training and industry standard and statutorily compliant security measures and safeguards. Farmers has shown itself to be wholly incapable of protecting Plaintiffs' PII.

82. Plaintiffs and Class members also have an interest in ensuring that their personal information that was provided to Farmers is removed from Farmers' unencrypted files.

Plaintiffs and the Class Suffered Damages.

**Facts Relevant To Plaintiff Mia Garcia**

83. Farmers received Plaintiff Mia Garcia's PII in connection with her application for insurance. In requesting and maintaining Plaintiff's PII for business purposes, Farmers expressly and impliedly promised, and undertook a duty, to act reasonably in its handling of Plaintiff's and Class members' PII. Farmers did not, however, take proper care of Plaintiff's and Class members' PII, leading to its exposure to and exfiltration by cybercriminals as a direct result of Farmers' inadequate security measures.

84. In August 2025, Plaintiff received an emailed letter from Defendant notifying her that a security incident exposed her PII to criminals.

85. Upon receiving the Notice, Plaintiff spent time reviewing her credit reports, reviewing various credit alerts received by text and email, checking her financial information,

and dealing with increased spam text messages and emails.

86. Plaintiff has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from her PII being placed in the hands of unauthorized third parties and possibly criminals. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach.

87. Plaintiff has experienced anxiety and increased concerns arising from the fact that her PII has been or will be misused and from the loss of her privacy.

88. The risk is not hypothetical. Here, cybercriminals intentionally stole the data, misused it, threatened to publish, or has published it on the Dark Web, and the sensitive information, including names and Social Security numbers, is the type that could be used to perpetrate identity theft or fraud.

89. Plaintiff further suffered actual injury in the form of damages to and diminution in the value of Plaintiff's PII—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and because of the Data Breach.

90. Future identity theft monitoring is reasonable and necessary, and such services will include future costs and expenses.

91. Plaintiff has a continuing interest in ensuring that her PII which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**Facts Relevant To Plaintiff Jacqulyn McGlynn**

92. Farmers received Plaintiff McGlynn's PII in connection with her application for insurance. In requesting and maintaining Plaintiff's PII for business purposes, Farmers expressly and impliedly promised, and undertook a duty, to act reasonably in its handling of Plaintiff's and Class members' PII. Farmers did not, however, take proper care of Plaintiff's and Class members' PII, leading to its exposure to and exfiltration by cybercriminals as a direct result of Farmers' inadequate security measures.

93. In August 2025, Plaintiff received an emailed letter from Defendant notifying her that a security incident exposed her PII to criminals.

94. Upon receiving the Notice, Plaintiff spent time reviewing her credit reports, reviewing various credit alerts received by text and email, checking her financial information, and dealing with increased spam text messages and emails.

95. Plaintiff has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from her PII being placed in the hands of unauthorized third parties and possibly criminals. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach.

96. Plaintiff has experienced anxiety and increased concerns arising from the fact that her PII has been or will be misused and from the loss of her privacy.

97. The risk is not hypothetical. Here, cybercriminals intentionally stole the data, misused it, threatened to publish, or has published it on the Dark Web, and the sensitive information, including names and Social Security numbers, is the type that could be used to perpetrate identity theft or fraud.

98. Plaintiff further suffered actual injury in the form of damages to and diminution in the value of Plaintiff's PII—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and because of the Data Breach.

99. Future identity theft monitoring is reasonable and necessary, and such services will include future costs and expenses.

100. Plaintiff has a continuing interest in ensuring that her PII which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**Plaintiffs' And Class Members' Damages**

101. For the reasons mentioned above, Farmers' conduct, which allowed the Data Breach to occur, caused Plaintiffs and Class members significant injuries and harm in several

ways. Plaintiffs and Class members must immediately devote time, energy, and money to: 1) closely monitor their medical statements, bills, records, and credit and financial accounts; 2) change login and password information on any sensitive account even more frequently than they already do; 3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and 4) search for suitable identity theft protection and credit monitoring services, and pay to procure them. Plaintiffs and Class members have taken or will be forced to take these measures in order to mitigate their potential damages as a result of the Data Breach.

102. Once PII is exposed, there is little that can be done to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiffs and Class members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct.

103. As a result of Defendant's failures, Plaintiffs and Class members are also at substantial and certainly impending increased risk of suffering identity theft and fraud or misuse of their PII.

104. Further, because Defendant delayed in discovering and notifying Plaintiffs about the Data Breach, Plaintiffs was unable to take affirmative steps during that time period to attempt to mitigate any harm or take prophylactic steps to protect against injury.

105. From a recent study, 28% of consumers affected by a data breach become victims of identity fraud—this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[40]

106. Plaintiffs are also at a continued risk because their information remains in

---

[40] Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KNOWBE4, https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud (last visited September 12, 2025).

Farmers' computer systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Farmers fails to undertake the necessary and appropriate security and training measures to protect its customers' and employees' PII.

107. In addition, Plaintiffs and Class members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers.

## CLASS ALLEGATIONS

108. Plaintiffs bring all counts, as set forth below, individually and as a Class action, pursuant to the provisions of the Fed. R. Civ. P. 23, on behalf of a Class defined as:

> All individuals within the United States of America whose PII and/or financial information was exposed to unauthorized third parties as a result of the data breach experienced by Defendant, including all who received a Notice of the Data Breach (the "Class").

109. Excluded from the Class are Defendant, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

110. This proposed Class definition is based on the information available to Plaintiffs at this time. Plaintiffs may modify the Class definition in an amended pleading or when he moves for Class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

111. **Numerosity – Fed. R. Civ. P. 23(a)(1)**: Plaintiffs are informed and believes, and thereon alleges, that there are at minimum, over a thousand members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Farmers' records, including but not limited to the files implicated in the Data Breach.

112. **Commonality – Fed. R. Civ. P. 23(a)(2):** This action involves questions of law and fact common to the Class. Such common questions include, but are not limited to:

a. Whether Farmers had a duty to protect Plaintiffs' and Class members' PII;

b. Whether Farmers was negligent in collecting and storing Plaintiffs' and Class members' PII, and breached its duties thereby;

c. Whether Farmers breached its fiduciary duty to Plaintiffs and the Class;

d. Whether Farmers breached its duty of confidence to Plaintiffs and the Class;

e. Whether Farmers violated its own Privacy Practices;

f. Whether Farmers entered a contract implied in fact with Plaintiffs and the Class;

g. Whether Farmers breached that contract by failing to adequately safeguard Plaintiffs' and Class members' PII;

h. Whether Farmers was unjustly enriched;

i. Whether Plaintiffs and Class members are entitled to damages as a result of Farmers' wrongful conduct; and

j. Whether Plaintiffs and Class members are entitled to restitution as a result of Farmers' wrongful conduct.

113. **Typicality – Fed. R. Civ. P. 23(a)(3)**: Plaintiffs' claims are typical of the claims of the members of the Class. The claims of the Plaintiffs and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiffs and members of the Class all had information stored in Farmers' System, each having their PII exposed and/or accessed by an unauthorized third party.

114. **Adequacy of Representation – Fed. R. Civ. P. 23(a)(3)**: Plaintiffs are an adequate representative of the Class because their interests do not conflict with the interests of the other Class members Plaintiffs seeks to represent; Plaintiffs has retained counsel competent and experienced in complex Class action litigation; Plaintiffs intends to prosecute this action

vigorously; and Plaintiffs' counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class members will be fairly and adequately protected and represented by Plaintiffs and Plaintiffs' counsel.

115. **Injunctive Relief, Fed. R. Civ. P. 23(b)(2):** Defendant has acted and/or refused to act on grounds that apply generally to the Class therefore making injunctive and/or declarative relief appropriate with respect to the Class under 23(b)(2).

116. **Superiority, Fed. R. Civ. P. 23(b)(3):** A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Farmers. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

117. Farmers has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

118. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Farmers failed to timely and adequately notify the public of the Data Breach;

b. Whether Farmers owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their PII;

c. Whether Farmers' security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

d. Whether Farmers' failure to institute adequate protective security measures amounted to negligence;

e. Whether Farmers failed to take commercially reasonable steps to safeguard consumers' and employees' PII; and

f. Whether adherence to FTC data security recommendations and measures recommended by data security experts would have reasonably prevented the Data Breach.

119. Finally, all members of the proposed Class are readily ascertainable. Farmers has access to Class members' names and addresses affected by the Data Breach. Class members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## FIRST CAUSE OF ACTION
## NEGLIGENCE
## (Plaintiffs on behalf of the Class)

120. Plaintiffs restate and reallege the preceding allegations above as if fully alleged herein.

121. Plaintiffs bring this claim individually and on behalf of the Class.

122. Defendant owed a duty to Plaintiffs and Class members to exercise reasonable care in safeguarding and protecting their PII in its possession, custody, and control.

123. Defendant's duty to use reasonable care arose from several sources, including but not limited to those described below.

124. Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiffs and Class members were the foreseeable and probable victims of any inadequate security practices on the part of the Defendant. By collecting and storing

valuable PII that is routinely targeted by criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats.

125. Defendant breached the duties owed to Plaintiffs and Class members and thus were negligent. As a result of a successful attack directed towards Defendant that compromised Plaintiffs' and Class members' PII, Defendant breached its duties through some combination of the following errors and omissions that allowed the data compromise to occur:

(a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its customers; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII.

126. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class members, their PII would not have been compromised.

127. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class members have suffered injuries, including, but not limited to:

a. Theft of their PII;

b. Costs associated with the detection and prevention of identity theft and unauthorized use of their PII;

c. Costs associated with purchasing credit monitoring and identity theft protection services;

d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

g. Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiffs' and Class members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class members' data; and

i. Emotional distress from the unauthorized disclosure of PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiffs and Class members.

128. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages,

in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and Class Members)**

129. Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

130. Plaintiffs bring this claim individually and on behalf of the Class.

131. Plaintiffs and Class members were required to provide Defendant with their Private Information in order to receive insurance services.

132. When Plaintiffs and Class members provided their Private Information to Defendant when seeking services, they entered into implied contracts in which Defendant agreed to comply with its statutory and common law duties to protect their Private Information and to timely notify them in the event of a Data Breach.

133. Based on Defendant's representations, legal obligations, and acceptance of Plaintiffs' and the Class members' Private Information, Defendant had an implied duty to safeguard their Private Information through the use of reasonable industry standards. This implied duty was reinforced by Defendant's representations in its Privacy Policy.

134. Defendant breached the implied contracts by failing to safeguard Plaintiffs' and Class members' Private Information and failing to provide them with timely and accurate notice of the Data Breach. Indeed, it took Defendant months to warn Plaintiffs and Class member of their imminent risk of identity theft. Defendant also failed to notify Plaintiffs and the Class members whether or not their Private Information was compromised, leaving Plaintiffs and Class Members unsure as to the extent of the information that was compromised.

135. As a direct and proximate result of Defendant's breach of implied contract, Plaintiffs and Class members have suffered damages, including foreseeable consequential damages that Defendant knew about when it requested Plaintiffs' and the Class members' Private Information.

**THIRD CAUSE OF ACTION**

**UNJUST ENRICHMENT**
**(Plaintiffs on behalf of the Class)**

136. Plaintiffs restate and reallege the preceding allegations above as if fully alleged herein.

137. Plaintiffs bring this claim individually and on behalf of the Class.

138. Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiffs and the Class members.

139. As such, a portion of the payments made by or on behalf of Plaintiffs sand the Class members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

140. Plaintiffs and Class members conferred a monetary benefit on Defendant. In exchange, Plaintiffs and Class members should have received from Defendant the goods and services that were the subject of the transaction and have their PII protected with adequate data security.

141. Defendant knew that Plaintiffs and Class members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII of Plaintiffs and Class members for business purposes.

142. In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiffs and Class members by utilizing cheaper, ineffective security measures. Plaintiffs and Class members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

143. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class members, because Defendant

failed to implement appropriate data management and security measures that are mandated by its common law and statutory duties.

144. Defendant failed to secure Plaintiffs' and Class members' PII and, therefore, did not provide full compensation for the benefit Plaintiffs and Class members provided.

145. Defendant acquired the PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

146. If Plaintiffs and Class members knew that Defendant had not reasonably secured their PII, they would not have agreed to have their information provided to Defendant.

147. Plaintiffs and Class members have no adequate remedy at law.

148. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have suffered injuries, including, but not limited to:

a. Theft of their PII;

b. Costs associated with purchasing credit monitoring and identity theft protection services;

c. Costs associated with the detection and prevention of identity theft and unauthorized use of their PII;

d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of

criminals;

g. Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiffs' and Class members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class members' data; and

i. Emotional distress from the unauthorized disclosure of PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiffs and Class members.

149. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have suffered and will continue to suffer other forms of injury and/or harm.

150. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class members overpaid for Defendant's services.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief as follows:

a. For an Order certifying this action as a Class action and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel;

b. For equitable relief enjoining Farmers from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and

Class members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class members;

c. For equitable relief compelling Farmers to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Personal Information compromised during the Data Breach;

d. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Farmers' wrongful conduct;

e. Ordering Farmers to pay for not less than three years of credit monitoring services for Plaintiffs and the Class;

f. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g. For an award of punitive damages, as allowable by law;

h. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i. Pre- and post-judgment interest on any amounts awarded; and,

j. Such other and further relief as this court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a jury trial on all claims so triable.

Dated: September 16, 2025

Respectfully submitted,

*/s/Eric Lechtzin*

Eric Lechtzin (I.D. # 248958)
Marc H. Edelson*
Liberato P. Verderame*
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N300
Newtown, PA 18940
T: (215) 867-2399
medelson@edelson-law.com
lverderame@edelson-law.com

*Attorneys for Plaintiff and the Putative Class*

* *pro hac vice* anticipated